**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DELILAH KEY,**

      **Petitioner,**

**vs.**

                              **CASE NO. 4:08cv379-WS/WCS**

**WALTER McNEIL,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Delilah Key pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner challenges her conviction for burglary of a dwelling with a person assaulted in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2003CF831A1. *Id.* She was sentenced to life in prison as a prison releasee reoffender. Doc. 13, p. 1. Respondent filed an answer and the record in paper form. Doc. 13. References to exhibits herein are to the record in paper form. Petitioner filed a traverse. Doc. 15. Respondent concedes that the petition was timely filed. Doc. 13, p. 2.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court. 28 U.S.C. §§ 2254(b)(1), (c)." O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). To properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented to the state courts." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (citing Picard). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).[1]

While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional claim is raised. Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); see also McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner must "do more than scatter some makeshift needles in the haystack of the state court record") (citations omitted). The petitioner also "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854

---

[1] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant. Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

(11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal).

If a claim was not fairly presented but is procedurally barred from further state court review,[2] Petitioner must demonstrate cause for the default and actual prejudice, *or* demonstrate that the constitutional violation has probably resulted in conviction of an innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).

For a claim which was fairly presented and adjudicated on the merits by the state court, the state court's factual determinations are presumed correct unless the Petitioner rebuts the presumption by clear and convincing evidence.  § 2254(e)(1); Fugate v. Head, 261 F.3d 1206, 1215 and n. 11 (11th Cir. 2001) (citation omitted). Section 2254(e)(2) provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
>   (A) the claim relies on –
>
>       (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;  or
>
>       (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;  and

---

[2] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available."  The court therefore refers to "fairly presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default.  *See* O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

As explained by the Supreme Court, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements."  (Michael) Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000).

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, *himself or herself contributing to the absence of a full and fair adjudication in state court*, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.  *Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.*  Yet comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort.

529 U.S. at 437, 120 S.Ct. at 1491 (emphasis added).

Further, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389

(2000); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125

(2000).

> The "contrary to" clause in § 2254(d)(1) "suggests that the state court's
> decision must be substantially different" from the relevant Supreme Court
> precedent. Although a state court's decision that "applies a rule that
> contradicts the governing Supreme Court law is "contrary," a state court
> decision that applied "the correct legal rule" based on Supreme Court law
> to the facts of the petitioner's case would not fit within the "contrary to"
> clause even if the federal court might have reached a different result
> relying on the same law. In evaluating the "'unreasonable application'
> inquiry," the federal court should consider whether the state court's
> application of the law was "objectively unreasonable" and should not apply
> the subjective "'all reasonable jurists'" standard. The Supreme Court
> clarified that, under 28 U.S.C. § 2254(d)(1), the federal court may not
> issue the writ unless it finds that the state court applied Supreme Court
> law unreasonably.

<u>Fugate</u>, 261 F.3d at 1216 (summarizing the conclusions in <u>Williams</u>, citations omitted).

For an ineffectiveness of counsel claim, the "clearly established" standard is set

forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under <u>Strickland</u>, "[a] convicted defendant making a claim of ineffective assistance of

counsel must identify the acts or omissions of counsel that are alleged not to have been

the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In

determining whether counsel gave adequate assistance, "counsel is strongly presumed

to have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner

has a heavy burden, as he must show that "no competent counsel would have taken the

action that his counsel did take." <u>Fugate</u>, 261 F.3d at 1217 (citation omitted). There are

no rigid requirements or absolute duty to investigate a particular line of defense, and "more is not always better." *Id.* (citations omitted).

Even if Petitioner can show deficient performance, he must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

While <u>Strickland</u> explained the performance and prejudice prongs of analysis, the court need not address them in that order or even address both, as failure to demonstrate either step of <u>Strickland</u> is dispositive of the claim against the petitioner. 466 U.S. at 697, 104 S.Ct. at 2069.

**Ground one**

Petitioner was arrested on February 28, 2003, on unrelated charges, and as she was taken in handcuffs to the police car, the victim of the burglary and assault had a chance to view Petitioner. The victim identified Petitioner as the person who broke into her home and assaulted her. Petitioner alleges that she was denied due process because the victim was permitted to make an in-court identification of her after this allegedly unfair "show-up" identification. Respondent concedes that state court remedies were exhausted as to this claim and addresses the merits. Doc. 13, pp. 3-4.

This claim depends upon the state court's evidentiary ruling, and like all evidentiary rulings, there is a significant difference between an evidentiary error and a denial of due process. An error of state law in the admission or exclusion of evidence is

not, standing alone, a violation of due process. Thigpen v. Thigpen, 926 F.2d 1003,

1011 (11th Cir. 1991).

> When reviewing a state court evidentiary ruling, generally federal courts "are not empowered to correct erroneous evidence rulings of state trial courts" *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir. 1984) (citations omitted). "Nevertheless, when a state trial court's evidence rulings deny a habeas petitioner fundamental constitutional protections, this [c]ourt's duty requires it to enforce the constitution's guarantees by granting the petition for a writ of habeas corpus." *Id.* at 1544. Before relief can be granted the error "must rise to the level of a denial of fundamental fairness." *Hall v. Wainwright*, 733 F.2d 766, 770 (11th Cir.1984) (quotations and citations omitted). Such fundamental unfairness violates the Due Process Clause of the Federal Constitution. *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.1976).

> A denial of fundamental fairness occurs whenever the improper evidence "is material in the sense of a crucial, critical, highly significant factor." *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir.1983).

Snowden v. Singletary, 135 F.3d 732, 737 (11th Cir.), *cert. denied*, 525 U.S. 963 (1998).

These basic due process principles have been specifically applied by the

Supreme Court to eye witness identification evidence. The due process issue is

whether "the confrontation conducted . . . was so *unnecessarily suggestive* and

conducive to *irreparable* mistaken identification that [a defendant] was denied due

process of law." Stovall v. Denno, 388 U.S. 293, 301-302, 87 S.Ct. 1967, 1972, 18

L.Ed.2d 1199 (1967) (emphasis added).

> Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. *But as Stovall makes clear, the admission of evidence of a showup without more does not violate due process.*

Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) (emphasis

added).

Further, unnecessary suggestiveness during a "showup" does not, standing alone, require the exclusion of evidence. *Id.*, at 198-199, 93 S.Ct. at 382.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

409 U.S. at 199-200, 93 S.Ct. at 382. Accordingly, the Eleventh Circuit follows the two-step analysis set forth in Neil v. Biggers. First, the court must determine "whether the original identification procedure was *unduly* suggestive." Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988) (emphasis added). If it was, then the court must "consider whether, under the totality of the circumstances, the identification was nonetheless reliable" by application of the five factors identified in Neil v. Biggers. *Id.* If the pretrial identification procedure was not unduly suggestive, the court need not reach the five factors identified in Neil v. Biggers. *Id.* at 897.

To properly consider this claim, this court must first determine the factual record that was presented to the state trial court and then must examine the trial court's ruling. Jury selection for the trial was conducted on December 5, 2003. Ex. E (transcript). On December 10, 2003, the day before the trial, Petitioner moved to suppress the out of court identification obtained from the victim, Helen Sinclair, which occurred on February 28, 2003. Ex. A, R. 17. Petitioner alleged:

> On February 4th Helen Sinclair, reported to the police that someone had entered her home and attacked her with a screw driver. That same evening Officer Glunt of the Tallahassee Police Department arrived at her trailer to take a statement. Ms. Sinclair described the individual as a person with mannish features and short red hair.

On February 28, 2003, Investigator Adams, Investigator Abbey and Officer Randolph from Tallahassee Police Department, went to 110 American Street to arrest Delilah Key on unrelated warrants from Gadsden County. However, Officer Randolph mistakenly went to 108 Americana Street. When he knocked on the door to 108 Americana, Helen Sinclair answered. Ms. Sinclair discussed her burglary with Officer Randolph and Investigator Adams. Ms. Sinclair expressed concern that the person who was being arrested at that time may have burglarized her trailer. In response Investigator Adams suggested Ms. Sinclair take a look at Defendant when she was removed from the trailer.

Defendant was removed from the trailer, in handcuffs and walked to the patrol vehicle as Ms. Sinclair observed her. Upon viewing Defendant Ms. Sinclair indicated that she believed Defendant was the person who broke into her trailer on February 4, 2003. This was the only identification of the Defendant.

Ex. A, R. 17-18.

Petitioner then alleged facts from the deposition of Helen Sinclair relevant to the five factors identified in Neil v. Biggers. *Id.*, R. 18-19. It was asserted that Sinclair had testified that the intruder covered his or her face with a jacket, pushed Sinclair into a bedroom, and attempted to hit her with a screw driver. *Id.*, R. 19. It was asserted that Sinclair testified that she was not hit by the screwdriver, and that she lifted her arms in front of her in defense. *Id.* It was asserted that Sinclair immediately called the police and described the intruder as Black, 160 pounds, 5 feet 6 inches tall, unsure of gender, having mannish features, short red hair, wearing a green shirt and blue jeans, . *Id.* Finally, it was asserted that the incident occurred on February 4, 2003, and the showup identification occurred on February 28, 2003. *Id.*

The trial commenced on December 11, 2003. Ex. F (transcript). The trial court held that the motion to suppress the out of court identification was "not timely pursuant to either the case management order or the pretrial order." *Id.*, p. 4. The court said it

had discretion whether to rule on it then, and determined that the motion could be "adequately addressed by an objection at the appropriate time." *Id.*

Prior to the hearing on the motion to suppress, the State had introduced evidence that no fingerprints were found at Ms. Sinclair's home, that some of the surfaces checked were not good surfaces for retaining a fingerprint, and that the front door had pry marks and could easily be pried open with a screwdriver. Ex. F, pp. 50-61. Ms. Sinclair had testified that at 5:15 a.m. on February 4, 2003, she was in bed and heard her door click open. *Id.*, pp. 65-66. She had a light on in her bedroom (that came on with a timer) and on her front porch. *Id.*, p. 67. She said that as she came down her hallway, a person came around the corner. *Id.* Sinclair said she backed up toward her bedroom, trying to get out the back door. *Id.*, p. 68. She said that the intruder picked up Sinclair's uniform jacket, which was on a chair, covered his or her face, and said "police, police." *Id.* Sinclair had a police jacket since she worked as a school crossing guard. Sinclair said that she knew it was not the police because she saw the person's face before the jacket went up. *Id.* The intruder was steadily "rushing" Sinclair with a screwdriver in his or her hand. *Id.*, p. 69. Sinclair said that in order to keep the screwdriver in hand, the intruder dropped the jacket. *Id.* Sinclair ended up in her bedroom. *Id.*, p. 70. The person had dropped the jacket by then. *Id.*, p. 71. The intruder shoved Sinclair and Sinclair fell upon her bed. *Id.*, p. 72. The person then got on top of Sinclair and was "coming down like this" with the screwdriver. *Id.* Sinclair said she raised her arm "to try to keep from getting hit in the face with it." *Id.* She said they "scuffled maybe 10, 15 minutes." *Id.* Sinclair said that eventually, she got the intruder off her, ran to the front, and went out of the door. *Id.* Sinclair said that when the

intruder was on top of her, she got a really good look at the person, and she was "face to face." *Id.*, pp. 72-73. Sinclair said that the intruder had short red hair, and was "maybe a shade darker than I am." *Id.*, p. 73. She said that the person was taller than her, that she is 5 feet 4 inches and the intruder was about five-six or five-seven. *Id.* Sinclair said that she "grabbed for their balls. I figured if it was a man, you, if I got hold to them, they would turn me loose. But I didn't find anything, so then I know it was – unless they were well padded, it had to be a woman." *Id.*, pp. 73-74. The intruder took Sinclair's planner, which had money in it. *Id.*, p. 74. When asked to describe the intruder's face, Sinclair said that depending on how a person wears his or her hair, "they could either go – they could either go for man or woman." *Id.*, pp. 74-75. She said she was not trying to identify anyone because "I was trying to get them off of me. I knew I could have been killed that way." *Id.*, p. 75.

After this evidence was introduced, argument on the motion to suppress was heard, out of the presence of the jury. *Id.*, pp. 75-76. Petitioner's attorney repeated much of what had been said in the motion. She said that on February 28, 2003:

> [W]hat they did was they knocked on the door. They were looking for Ms. Key. They mentioned that she was going to be arrested next door and it was Ms. Sinclair who mentioned that possibly this could be the person that may have burglarized her.

*Id.*, p. 78. The court asked Petitioner's counsel, Allison Dudley, to confirm this set of facts, and counsel did. *Id.*, p. 79. The following then took place:

> THE COURT: Well, they brought her out. They were going to take her out and put her in the police car and they said, Ms. Sinclair, look at her and see if that's the person. Is that the way that – in a nutshell here, but that's what I understand.
>
> MS. DUDLEY: Yes.

THE COURT: All right, I'm going to deny the motion.  I understand the motion, *you've made a record.*  I don't think it falls within any of the cases that – with regard – the facts are just different.  *I don't believe th police did anything that would be suggestive at all*, to have anything to do with this case, so I'm doing to deny the motion to suppress, or the motion to exclude the identification.

*Id.*, p. 79 (emphasis added).

The trial court's findings of fact as to suggestiveness are presumed correct unless the Petitioner rebuts the presumption by clear and convincing evidence.  § 2254(e)(1).  Petitioner has not done so.  Nor has Petitioner satisfied § 2254(e)(2), to try to show why additional facts were not established in the state court.  Consequently, the trial court's finding of fact, that the police officers accidentally contacted Ms. Sinclair on February 28, 2003, when the arrived to arrest Petitioner on other charges, is presumed to be correct.  Similarly, Petitioner's admission that before the showup occurred, it was Ms. Sinclair who voluntarily told the police that she thought that Petitioner was the one who had assaulted her, is now established for this court's purposes.

Thus, the police did nothing suggestive to cause Ms. Sinclair to see Petitioner in handcuffs, on her way to the police car.  An unduly suggestive showup is one engineered by the police and made to suggest to the witness that the person to be viewed is a suspect.  Ms. Sinclair might have seen Petitioner as she was arrested anyway, even had the police not accidentally called her to her door.  After all, Petitioner lived nearby.  More important, it was Ms. Sinclair who prompted the viewing by her belief that Petitioner was the assailant.  Thus, the police did nothing to suggest that Petitioner was a suspect.

Further, at the time the trial court ruled, there was a basis in the record to conclude that Ms. Sinclair, without prompting by the police, had a reasonable basis to suspect that Petitioner was the intruder.  Ms. Sinclair had testified that despite the fact that the intruder had briefly covered her face with Ms. Sinclair's jacket, Ms. Sinclair had a very good opportunity to see the face of the intruder during the assault and she had good reason to believe that the intruder was a woman.

Consequently, the trial court's legal ruling, that the police did nothing suggestive at all is correct.  Since the showup was not suggestive, and certainly not unduly suggestive, it was not error for the trial court to decline to address the five factors identified in Neil v. Biggers.  The evidence relevant to the five factors became matters properly considered by the jury as it weighed the evidence.  Therefore, the state court's denial of the motion to suppress the out of court identification has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground two**

Petitioner contends that her Sixth Amendment right to confront the witnesses was violated when the trial court refused to let her attorney cross-examine Ms. Sinclair about an earlier misidentification.  During the deposition of Ms. Sinclair, counsel for Petitioner showed Ms. Sinclair a photograph of another woman.  Ms. Sinclair identified the other woman as possibly the person who had assaulted her.  Doc. 1, p. 6; Ex. F, p. 12.

Respondent notes that at trial, counsel for Petitioner argued that unless

Petitioner was permitted to again show Ms. Sinclair the photograph of the other woman,

they would be "greatly hindered in our ability to discredit [Sinclair's] testimony

concerning her identification." Ex. F, pp.12-13. The trial court rejected the argument,

reasoning that "there are a lot of people on the face of the earth that can look like Ms.

Key." Ex. F, p. 13. The court said: "To specifically attempt to shift guilt to an empty

chair is not appropriate." *Id*. The court thought it would be entirely different if the

person suggested to Ms. Sinclair "specifically was a suspect or a co-defendant or

something like that." *Id.*, pp. 13-14. He reasoned in part that use of the photograph

would allow Petitioner to testify without cross examination since counsel got the

photograph from Petitioner. *Id.*, pp. 16-17. The court concluded that showing Ms.

Sinclair the photograph of the woman she had identified in her deposition as possibly

her assailant "would be inappropriate from an evidentiary standpoint." *Id.*, p. 15.

Respondent argues that this presented only a state law evidentiary claim. Doc.

13, p. 6. Respondent contends, therefore, that this federal claim was not fairly

presented to the state courts and is procedurally barred. Doc. 13, pp. 5-7.

Respondent is correct. Petitioner's claim before the trial court was only a state

law claim. Federal law was not mentioned.

This court cannot reach the merits of this claim in the absence of a showing of

cause for the default and prejudice to the outcome. Whether a showing of prejudice

could be made requires some analysis of federal law.

> Of course, the right to confront and to cross-examine is not absolute and
> may, in appropriate cases, bow to accommodate other legitimate interests
> in the criminal trial process. . . . But its denial or significant diminution

calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined

Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297

(1973). "[T]he right to cross-examine does not allow a litigant to elicit testimony that is

otherwise inadmissible." United States v. Lawrence, 349 F.3d 109, 120 (3rd Cir 2003),

*cert. denied*, 542 U.S. 944 (2004).

As to the evidentiary issue, "state and federal rulemakers have broad latitude

under the Constitution to establish rules excluding evidence from criminal trials."

Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503

(2006).

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . .
>
> *A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, e.g.*, 41 C.J.S., Homicide § 216, pp. 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am.Jur.2d, Homicide § 286, pp. 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . *[Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial"* (footnotes omitted)). *Such rules are widely accepted, and neither petitioner nor his amici challenge them here.*

547 U.S. at 326-327, 126 S.Ct. at 1732-1733 (footnote omitted, emphasis added).

Cikora v. Dugger, 840 F.2d 893 (11th Cir. 1988) is an example of the

application of this rule.  In Cikora, the identification of the defendant was at issue.

Defendant's attorney tried to present evidence that another person lived in the victim's

neighborhood and looked like the defendant.  840 F.2d at 895.  The evidence was

excluded.  *Id.*  The court held:

> Federal courts have granted relief from state convictions when the trial
> court arbitrarily excluded evidence tending to show that another person
> might have committed the crime.  They have done so, however, only when
> there was some demonstration connecting another person to the particular
> crime for which the defendant was on trial.

840 F.2d at 898.  The court also said:

> Due process may require a trial court to allow the introduction of evidence
> of another party's possible guilt when there is some showing of a nexus
> between the other party and the particular crime with which a defendant is
> charged.

*Id.*  The claim was denied as petitioner in that case had not made such a showing.  *Id.*

Applying this federal law, Petitioner has not shown prejudice because she has

not shown a viable federal claim.  There was no showing that there was any evidentiary

connection between the woman in the photograph and this crime.  This court, therefore,

cannot reach the merits of ground two.[3]

**Ground three**

Petitioner contends that she was denied a fundamentally fair trial because the

trial court allowed the jury to hear evidence of Petitioner's arrest for another offense.

---

[3] As is the usual case, analysis of prejudice requires analysis of the merits of the
federal claim.  The court might alternatively reach the merits to deny the claim.  "An
application for a writ of habeas corpus may be denied on the merits, notwithstanding the
failure of the applicant to exhaust the remedies available in the courts of the State."  28
U.S.C. § 2254(b)(2).

Doc. 1, p. 8. This was the arrest on February 28, 2003, when Ms. Sinclair identified

Petitioner. Respondent argues that this issue was presented to the state court solely as

a state law issue and is, therefore, procedurally defaulted. Doc. 13, p. 9.

Respondent is correct. Petitioner filed a motion in limine to exclude evidence

that Petitioner had been taken into custody on February 28, 2003, at the time of the

identification. Ex. F, p. 4. Petitioner argued that the jury might think that Petitioner was

arrested on evidence of the crime at issue that "they might not hear." *Id.*, p. 5. The

court offered to instruct the jury that Petitioner was arrested for a reason that had

nothing to do with this case and was not evidence of guilt. *Id.*, pp. 6-8. Petitioner's

attorney said nothing further, and seemed satisfied with the court's decision. *Id.*, p. 8.

Accordingly, when evidence of Petitioner's arrest was presented at trial, the court

instructed the jury that:

> the fact that defendant was taken into custody by the police department is
> not an issue for you to resolve. It has nothing to do – it's not relevant to
> whether the defendant is guilty or not guilty on the facts of this case, so
> you're not to consider it in any way whatsoever except for the purpose for
> which it's offered, and that's for the identification issue.

Ex. F, pp. 99-100. Petitioner renewed her objection to the testimony as to the arrest,

and the objection was overruled. *Id.*, p. 100.

On direct appeal, Petitioner said that the standard of review was the standard for

review of admissibility of evidence. Ex. H, p. 32. Petitioner did not mention due

process or federal law. Consequently, the federal claim was not fairly presented and is

procedurally defaulted.  Petitioner has not shown cause or prejudice for the default, and this court cannot reach the merits of the claim.[4]

**Ground four**

Petitioner contends that she was denied due process when the trial court denied her motion for a new trial without a hearing.  Petitioner asserts that when the trial ended, the prosecutor informed the court and Petitioner that Officers Glunt and Roberts were not called as witnesses for the prosecution because they had reasons not to believe Ms. Sinclair.  The motion for a new trial argued that this was a discovery violation.  Petitioner argues that the State was obligated to reveal this exculpatory evidence.  Doc. 1, p. 9.

Petitioner asserted in her motion for a new trial that after trial concluded, as counsel for Petitioner and the prosecutor were awaiting for the jury's verdict, the prosecutor told him that Officer Roberts was not called as a witness because he thought the victim was "crazy," and Officer Glunt was not called because he "had reason not to believe the victim, as well."  Ex. A, R. 68.  Petitioner presented a federal Brady,[5] arguing that the prosecution withheld material evidence that reasonably could have placed the

---

[4] If the merits were to be reached, I cannot see how the evidence might have been excluded.  The February 28, 2003, identification of Petitioner by Ms. Sinclair was central to the prosecution's case.  The circumstances of that identification could not have been fairly explained to the jury without evidence that the police had Petitioner in custody and Ms. Sinclair saw Petitioner as she was taken to the waiting police vehicle.

[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  Brady held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S.Ct. at 1196-97.

whole case in a different light so as to undermine the conviction, citing a <u>Brady</u> case,

<u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). *Id.*,

R. 69.

The motion for a new trial was scheduled to be heard on January 7, 2004. Ex. B,

order granting motion to supplement the record on appeal; transcript of January 7,

2004, hearing. Petitioner was mistakenly not transported from jail for the hearing.

Transcript, p. 3. The court said that the motion had been read and the court wanted to

see the depositions of Glunt and Roberts. *Id.*, p. 4. The hearing adjourned with the

court's intent to set reset the hearing. *Id.*, p. 5.

Another proceeding took place on August 17, 2004. Ex. B, transcript of August

17, 2004, hearing. The court had, in the meantime, mistakenly denied the motion

without a hearing. *Id.*, p. 3. The court noted that Petitioner again was not present on

August 17th. *Id.*, p. 4. Petitioner's attorney said that the proceeding was not a hearing

on the motion, but just a statement of what happened. *Id.* The court explained that

after the first proceeding, the depositions were received and examined, and the court

decided to deny the motion because "defense had an opportunity to depose these

witnesses and these issues didn't come out and they had their opportunity and it wasn't

there." *Id.*, p. 6. The court said "right or wrong," a hearing was not held. *Id.* The court

said "so I entered the order [denying the motion for a new trial] based on what I saw in

the depositions and I did not reset it [a hearing]." *Id.*, p. 7. A notice of appeal had been

filed on January 14, 2004. Ex. A, p. 4. The court said that if the appeals court

remanded for an evidentiary hearing, or relinquished jurisdiction, one would be held, but

the court assumed it had lost jurisdiction. Ex. B, pp. 8, 10. The court determined that

the two depositions were a part of the record on appeal because they were relied upon in denying the motion for a new trial.  *Id.*, p. 9.

The only issue raised on direct appeal was that "the trial court erred in denying appellant's motion for a new trial without a hearing."  Ex. H, p. 35.  Alternatively, however, Petitioner argued the merits of a <u>Brady</u> violation.  *Id.*, pp. 38-42.  Petitioner argued that since the trial court did not hold an evidentiary hearing, the appellate court was required to accept Petitioner's factual allegations as true "to the extent they are not refuted by the record."  *Id.*, p. 40.  Petitioner cited <u>Peede v. State</u>, 748 So. 2d 253, 257 (Fla. 1999), which so held on appeal from denial of Rule 3.850 relief.  *Id.*

Petitioner argued on appeal that Officer Roberts had said that he had "reason not to believe Ms. Sinclair."  *Id.*  Petitioner contended that Officer Glunt had said that he thought Ms. Sinclair was "crazy."  *Id.*  These allegations of fact came from Petitioner's motion for a new trial.  Petitioner argued on appeal that had she known of these opinions, she might have discovered the factual basis for the opinions and called both officers as witnesses at trial, to discredit Ms. Sinclair.  *Id.*  Petitioner argued that the testimony was probably important to the defense because the prosecutor declined to call them as witnesses.  *Id.*  Petitioner asserted that although she did depose the two officers, she could not have discovered their specific opinions about the credibility of Ms. Sinclair even with reasonable diligence.[6]  *Id.*, p. 41.

---

[6] The depositions were attached by the state court to the record.  Ex. B.  Officer Glunt did not testify that he thought Ms. Sinclair was crazy.  *Id.*, pp. 21-29.  Officer Roberts did not testify that he had reason not to believe Ms. Sinclair.  *Id.*, pp. 33-35.  The depositions, however, were stricken from the appellate record by the appellate motion panel on motion of Petitioner.  Ex. I, pp. 29, 34.  The appellate court's *per curiam* decision did not restore the depositions to the record, despite the State's argument that

Thus, since there has not been an evidentiary hearing in the state court or in this court, it must be assumed that the factual allegations in the motion for a new trial, that both officers expressed adverse opinions about the credibility of Ms. Sinclair and shared those opinions with the prosecutor before trial, is true.

In response on appeal, the State argued that the opinions of the two officers about the credibility of Ms. Sinclair would not have been admissible under Florida law, in any event. Ex. I, p. 32. The opinions would not be admissible as the victim's reputation in the community, pursuant to FLA. STAT. § 90.405, and would not be proper evidence of the victim's character, pursuant to FLA. STAT. § 90.404. *Id.* Appellant cited <u>Acosta v. State</u>, 798 So. 2d 809 (Fla. 4th DCA 2001), which held:

> It is clearly error for one witness to testify as to the credibility of another witness. *Boatwright v. State*, 452 So. 2d 666, 668 (Fla. 4th DCA 1984) ("It is an invasion of the jury's exclusive province for one witness to offer his personal view on the credibility of a fellow witness."). It is especially harmful where the vouching witness is a police officer because of the great weight afforded an officer's testimony. *Page v. State*, 733 So. 2d 1079 (Fla. 4th DCA 1999).

798 So. 2d at 810. *Accord,* <u>Tumblin v. State</u>, 29 So. 3d 1093, 1101 (Fla. 2010) (it was error for an officer to testify: "I did assure Detective Coleman in front of Mayes that I felt like Mayes would – would tell him the truth.").

The State's argument is correct, especially in light of <u>Tumblin</u>. The opinions as alleged would not have been admissible under Florida evidentiary law. Hence, there could not have been a <u>Brady</u> violation to that extent.

---

they should have been in the appeals record. Ex. K.

As noted above, Petitioner made a subsidiary argument on appeal. Petitioner argued that had Petitioner known of the opinions, Petitioner could have discovered the factual basis for the opinions. The factual basis of the opinions might have been independently admissible and relevant to the question of Ms. Sinclair's credibility. But we do not know if the opinions were based upon facts that might have been independently admissible or were simply opinions without basis. It is very possible that the opinions had no basis in independently admissible fact. The trial court noted that Ms. Sinclair "was kind of an odd duck – and she was, she was an odd lady, colorful." Ex. B, August 24, 2004, transcript, p. 7. If that was the basis for the opinions, the jury saw and heard Ms. Sinclair and could draw their own conclusions. But Petitioner did not allege in state court that any such independently admissible facts existed, and has not alleged any reason to believe so in this court. There is no reason for this court to hold an evidentiary hearing where there is no point in doing so.

Thus, assuming that the appellate court reached the merits of the Brady claim, Petitioner has not shown that the decision has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Grounds five, six, and seven**

In ground five, Petitioner contends that her attorney was ineffective for failing to seek DNA testing on hair or other material in a hat that the victim said she removed from her assailant. Doc. 1, p. 12a (p. 12 on the electronic case filing docket, ECF). Petitioner asserts that at trial, the victim said that during the crime, the intruder's cap

came off and she found the cap the next morning in front of her home. *Id.* Petitioner

contends that her attorney should have had the cap tested for a DNA and hair

comparison. *Id.*

Respondent concedes that Petitioner exhausted state court remedies as to this

claim, at least to the extent that this was one of the arguments for the claim that counsel

was ineffective for a general failure to investigate. Doc. 13, pp. 12-13. Respondent

addresses the merits of this claim in argument related to ground fifteen. I will address

the claim here as ground five.

In Petitioner's Rule 3.850 motion, Petitioner asserted that Ms. Sinclair testified at

trial that the perpetrator's cap came off and she found a cap in the front of her home the

next day. Ex. L, p. 143. Petitioner asserts that any hair which might have been found in

the hat been subjected to DNA testing, that testing would have shown that it was not

Petitioner's DNA and this would have shown that Petitioner did not wear the hat. *Id.*

Petitioner raised this claim as ground one in her Rule 3.850 motion. *Id.* The Rule 3.850

court denied this claim, finding that it was "speculative at best." *Id.*, p. 161.

The court then granted an evidentiary hearing on other claims of ineffectiveness

in investigation. In the course of that hearing, counsel for Petitioner elicited testimony

as to why Petitioner's counsel did not seek DNA testing. Ex. N, p. 58. The State

objected to this line of questioning, arguing that the court had already denied the DNA

ineffectiveness claim. *Id.* The court overruled the objection, reasoning that a failure to

investigate DNA evidence was a part of claim 12 in the Rule 3.850 motion, a claim of

ineffectiveness generally for failure to investigate, and that claim that was set for the

evidentiary hearing. *Id.*, p. 59.

At the hearing, Petitioner said that she had a conversation with her attorney's investigator about getting the hat tested for DNA. Ex. N, pp. 23-24. She said she had never seen the hat mentioned by Ms. Sinclair. *Id.*, p. 11.

Petitioner's trial attorney, Allison Dudley, testified that the hat was found by the victim, not by the police. *Id.*, p. 56. She did not remember that she ever considered whether to test that hat for hair or skin for DNA purposes. *Id.*, p. 57. She could not recall discussing the hat or DNA evidence with Petitioner. *Id.* Ms. Dudley said that she thought that Ms. Sinclair kept the hat, that it had not been taken as evidence by the police. *Id.*, p. 58. In the deposition, Ms. Sinclair testified that she might still have the hat packed in a box somewhere. *Id.*, p. 60. Ms. Dudley agreed that the results of the DNA test might have been damaging to her defense. *Id.*, p. 68.

Even though this evidence was elicited at the hearing, the Rule 3.850 court did not again mention the claim that counsel was ineffective for failing to obtain DNA testing. Ex. M, R. 228-230. Since the trial court permitted the claim to proceed, allowing evidence to be presented, but did not make findings of fact, this court should presume that the state court's ruling was based upon the applicable law and the undisputed evidence presented.

Laboratory tests for DNA provide a remarkable new way to determine the possible or probable identify of one who commits a crime.

> At the same time DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. See *House v. Bell*, 547 U.S. 518, 540-548, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt.

District Attorney's Office for Third Judicial Dist. v. Osborne, __ U.S. __, 129 S.Ct. 2308,

2316, 174 L.Ed.2d 38 (2009).

This claim, like any claim of ineffective assistance of counsel, must be based

upon something other than speculation.  "A convicted defendant making a claim of

ineffective assistance of counsel must identify the acts or omissions of counsel that are

alleged not to have been the result of reasonable professional judgment."  Strickland,

466 U.S. at 690, 104 S.Ct. at 2066.  "[C]ounsel is strongly presumed to have rendered

adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  A decision not to conduct

a DNA test of the material in the hat could have been a reasonable trial strategy, both

because the test might have inculpated Petitioner and because without a test, counsel

could argue that the prosecution's investigation was shoddy.  Skinner v. Quarterman,

528 F.3d 336, 341-342 (5th Cir. 2008).

Here, however, we know that the hat was not seized as evidence by law

enforcement.  Ms. Sinclair may have still had it in December, 2003, but by that time, the

evidentiary value had diminished because the hat had not been in secure police custody

for months.  It is also implicit from the evidence that Ms. Dudley did not think that

laboratory testing on the hat was worth pursuing, and in response to a leading question,

agreed that the results might have harmed Petitioner.  Given the failure of the police to

secure the hat and the consequent diminution in evidentiary value, it was not attorney

error to fail to seek out the hat, if it still existed, and have it tested.

Further, the claim is still insufficient on its face because Petitioner does not

credibly allege how the results of DNA testing would have been exculpatory.

Admittedly, it is hard to make such allegations where there has not been testing, but that is the law governing a claim of ineffectiveness. "Conclusory allegations of ineffective assistance are insufficient." Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992). Thus, a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel. Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986).

This case, therefore, is like in Rice v. Hall, 564 F.3d 523 (1st Cir. 2009), where there was nothing in the record to create "any likelihood that the result of forensic testing would have been exculpatory . . . ." 564 F.3d at 526. In the absence of such allegations, the argument for prejudice to the outcome "rests almost entirely upon 'mays' and 'could haves.' " *Id.* As a consequence, Petitioner has not shown that the state court's determination that this claim fails because it is "speculative" has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ground six**

Petitioner contends that her attorney was ineffective in failing to call a number of witnesses. Doc. 1, p. 12b (p. 13 on ECF). She contends that Dorothy Key, Paul Key, Elijah Key, all apparently family members, and Dwaine Dubose would have testified that Petitioner's hair had never been red or short, and that she had never dyed her hair. *Id.* She contends that Henry Johnson was present at her arrest and heard the police tell Petitioner that she was being arrested for violation of probation, which would contradict the "State's theory that Petitioner did not know why she was being arrested." *Id.*

Finally, Petitioner contends that Henry Johnson was an alibi witness who would have testified that Petitioner was with him when the crime was committed. *Id.* This is also the subject of ground seven, and it will be addressed there.

Respondent argues that the claim is procedurally defaulted with respect to potential testimony from Dorothy Key, Paul Key, Elijah Key, and Dwaine Dubose because this claim of ineffectiveness assistance was not raised on appeal from denial of the Rule 3.850 motion. Doc. 13, p. 14. Respondent's argument is not persuasive. While Petitioner's appellate attorney focused primarily upon the alibi witness and the DNA evidence that might have been in the cap, he also noted that at the Rule 3.850 evidentiary hearing, Petitioner testified that she had never had short red hair. Ex. O, p. 12. He noted that Petitioner had testified at that hearing that she had witnesses who would testify to her appearance on the day in question. *Id.*, p. 6. Counsel argued that trial counsel was ineffective for failing to "present testimony that challenged the identification." *Id.*, p. 14. Thus, the claim about that involves these five witnesses was fairly presented to the state courts.

Respondent concedes that the claim of ineffectiveness as to the alibi witness, Henry Johnson, was fairly presented to the state courts and state remedies have been exhausted.

At the Rule 3.850 evidentiary hearing, Petitioner testified that on the night of February 3, 2003, she was at a trailer park. Ex. N, p. 5. She said that she was at "Henry's girlfriend, my brother's trailer on Americana Drive" attending a birthday party. *Id.* She said she did not know Ms. Sinclair, the victim. *Id.*, p. 6. Petitioner said she lived far away from the victim's residence. *Id.* Petitioner said that she had heard that a

lady that lived on the back side of the trailer park "had been robbed by somebody." *Id.*,
p. 7. She said she went to that trailer park "basically every day, because that's where
Henry's girlfriend's family lived." *Id.* Petitioner said she, Henry, and his girl friend
stayed at the party that night until 11:30 or 12:00. *Id.*, p. 9. She said that they then
returned to their residence on Ridge Road. *Id.* Petitioner said that the house on Ridge
Road that they were staying in had a dead bolt on the door which could not be opened
without a key. *Id.* She said her brother locked the door at night and there was no way
she could have left the house, that she could not even have left through a window
because the windows were barred. *Id.*, pp. 9-10. She did not have her own
transportation, either. *Id.*, p. 10. Petitioner said that this residence was about one half
mile from the victim's residence. *Id.*, p. 25. Petitioner said that she told an Officer
"Longhorn" [Longman] that she was at her cousin's house when the offense occurred.
*Id.*, p. 28.

Petitioner said that on the night of the offense, her hair was black and shoulder
length, not short. *Id.*, pp. 10-11. She said she had never colored her hair red or had it
short. *Id.*, p. 11. She said that Ms. Sinclair had testified that the assailant had short
hair, "like hers," and Ms. Sinclair's hair was about two inches long. *Id.*, p. 30.

Petitioner said that she told her attorney that she was with her cousin Henry at
the trailer park that night, and he could verify her whereabouts. *Id.*, p. 12. She said she
told her attorney that her mother, brother, sister-in-law, and cousin Diane [sic, probably
Dwaine] could have testified that she has never worn her hair short or red, and that it
was not short at the time of the offense. *Id.* and p. 13. She said these people were
easy to contact and were available to testify. *Id.*, pp. 19-20. Petitioner said that after

the prosecution rested, her attorney told her that she was not calling any witnesses. *Id.*, p. 22. Petitioner said that her mother and cousin were at trial and available, and her lawyer knew it. *Id.*, p. 24. She said that her booking photograph about three weeks later showed that she wore her hair fairly long, in an Afro. *Id.*, p. 12. Counsel for Petitioner told the Rule 3.850 court that he had these witnesses available to testify at that hearing, and that they would testify to the length of Petitioner's hair and that it was not red. *Id.*, p. 32. The State agreed that they would so testify, and so those witnesses were not called. *Id.*, p. 33.

Petitioner repeated that she was living with her cousin, Henry Johnson, on the night of the offense. *Id.*, p. 15, 19. Petitioner admitted that when she was arrested, she exclaimed to the police that she "didn't break into that lady's house." *Id.*, pp. 19-20.

Henry Johnson testified that Petitioner is his cousin. *Id.*, p. 34. He said that on Monday, February 3, 2003, he and his girlfriend, Frances McKinney, and Petitioner were at a birthday party for McKinney's brother, Clarence, "down at his house," until 11:30 or 12:00 o'clock. *Id.* and p. 36. Ms. Sinclair's trailer was in the same trailer park about five to seven trailers away from Clarence's trailer. *Id.*, pp. 35-37. He said no one contacted him about this testimony prior to trial. *Id.*, p. 35.

Johnson testified that after leaving the party, they returned to his residence, which was just across the road and within a short walking distance of Ms. Sinclair's residence. *Id.*, p. 36. He said that his residence was a three bedroom home. *Id.*, p. 37. He said that Petitioner could not have *come in* the residence because the doors were locked with a deadbolt. *Id.*, p. 38. He also said that when Petitioner came in or left, she would have to pass where he was sleeping and "bump" him. *Id.* The deadbolt required

a key to unlock it and the key was not left in the lock. *Id.*, p. 39. He said the windows

had bars and there was no way someone could have exited through the front. *Id.* The

back door had the same kind of deadbolt without an available key. *Id.* Petitioner was in

the house when Johnson woke up the next morning. *Id.* Johnson said that the only key

to the house doors, front and back, was on his car key ring, and Petitioner did not

usually have it. *Id.*, p. 41. Johnson said that he was asleep the whole night. *Id.*, p. 43.

Johnson said that he and his girlfriend were drinking alcohol that night, but he could not

recall that Petitioner drank anything. *Id.*, p. 40.

Allison Dudley testified that she represented Petitioner. *Id.*, p. 44. She had been

an attorney since December, 1998, and had conducted about 22 trials on the date of

Petitioner's trial. *Id.* She had had only one prior felony trial, however. *Id.*, p. 57. For

that reason, her supervisor, Leonard Holton, assisted her during the trial. *Id.*, pp. 45,

57. Holton had been a lawyer for 30 years. *Id.*, p. 45.

Ms. Dudley said she had her first jail visit with Petitioner on October 17, 2003,

and Petitioner gave her the names of Henry Johnson and Frances McKinney. *Id.*, p. 46.

She said she had her investigator get photographs of another potential suspect, Zena

Wiggins, who matched the description given by the victim. *Id.*, pp. 46-47. Her

investigator contacted McKinney. *Id.*, p. 47. McKinney told her investigator that she

could not recall if Petitioner was with her and Henry Johnson on the night of February 3,

2003, but it was possible as Petitioner was then staying with them about two or three

times a week. *Id.* McKinney said she was taking Effexor for depression, was enrolled

in mental health counseling, and had problems with memory loss. *Id.*

Ms. Dudley said that she spoke with Johnson over the telephone. *Id.*, p. 47. He said that his house was about a block away from the home of Larry James, with whom Petitioner would also stay, and that Petitioner "would also go back and forth between staying with him and with James." *Id.* Ms. Dudley said:

> Mr. Johnson stated that about three months ago [Petitioner] called Henry [Johnson] to tell him about the charges that were being brought against her. Henry couldn't recall the specific date that [Petitioner] had been staying with him but did say that it was somewhere around the beginning of February time frame.
>
> He stated that [Petitioner] help refreshed [sic] his memory by telling him that it was the night that she were [sic] over and they talked and watched TV. He remembered her being there but said he went to bed around 10. And it was possible she could have left the house after he went to bed. His bedroom is right by the living room, and he always sleeps with the bedroom door open. He said that they did not drink that night.

*Id.*, p. 48.

Ms. Dudley said she talked with Petitioner at the jail on December 5th and discussed the plea offer, and they also discussed the alibi evidence from Johnson and McKinney. *Id.*, p. 49. The offer was for a fifteen year sentence as a prison releasee reoffender. *Id.*, p. 65. Ms. Dudley said she advised Petitioner that Johnson and McKinney would not help since McKinney had memory problems and Johnson said he went to sleep and it was possible that Petitioner left the residence that night. *Id.*, p. 49. Ms. Dudley said: "It didn't really strike me as a strong alibi. And I told Ms. Key that." *Id.* Ms. Dudley said she remembers some evidence about a party, but she did not recall the name Clarence McKinney. *Id.*, p. 50. She said that she and Petitioner came to an agreement that Johnson and McKinney would not be called as alibi witnesses. *Id.* Ms. Dudley also said that Officer Longman took Petitioner's statement on the day of the

arrest, and Petitioner told Officer Longman that on the relevant morning (presumably early morning) she had been with somebody named Doug but could not provide an alibi for that morning.  *Id.*, p. 68.

Ms. Dudley could not recall any specific discussions she had with Petitioner about calling the witnesses who would have testified about the length and color of her hair, but she said that they had the booking photograph in evidence, and she thought that the booking photograph depicted Petitioner's hair differently than as described by Ms. Sinclair, so they relied upon this evidence instead.  *Id.*, pp. 51-52.  She said that she thought that the booking photograph showed some damage from permanents, just as Petitioner's hair showed such damage during the hearing, and said that Petitioner's hair in the booking photograph was not an Afro, but "kind of loose."  *Id.*  The damage from permanents gave Petitioner's hair a "somewhat reddish tint."  *Id.*, p. 53.  Ms. Dudley said that Petitioner's hair at the hearing had a "slight reddish tint."  *Id.*  Ms. Dudley said that Petitioner did not mention these witnesses on the first visit, on October 17th.  *Id.*, p. 56.  She explained that Petitioner only identified Johnson and McKinney, the alibi witnesses.  *Id.*, p. 61.

Ms. Dudley said that she and Holton were concerned that Petitioner would cause damage to her defense if she testified because she had 22 felonies and those would be revealed to the jury.  *Id.*, p. 54.  Ms. Dudley said there was never an issue about the voluntariness of Petitioner's statement on arrest, that she had not robbed Ms. Sinclair. *Id.*, p. 55.

Petitioner was recalled and she denied that Ms. Dudley had read to her what Johnson and McKinney had told the investigator.  *Id.*, p. 74.

Case No. 4:08cv379-WS/WCS

The trial court denied this claim. The court concluded that Petitioner's testimony was not credible "on many levels." Ex. M, R. 228. The court noted that Petitioner had sought to minimize her prior convictions as "a lot of check charges," but she had been convicted of burglary of a dwelling while armed, armed robbery with a firearm, robbery, burglary of a structure, possession of a firearm by a convicted felon, had two prior convictions of resisting an officer with violence, and, in addition, had 10 convictions for financial felonies. *Id.*, R. 229. The court found that Petitioner's testimony that her attorney had not spent time on her case was contrary to the evidence. *Id.*

The court said that it was not necessary for counsel to have called the five witnesses who might have testified as to the length and color of Petitioner's hair since her booking photograph, taken only 24 days after the offense, was available. *Id.* The court said: "No additional testimony would have provided any better way for the jury to assess whether the victim's description was contradicted by Ms. Key's actual appearance," and "[t]he evidence fully supports Ms. Dudley's conclusion that it was pointless to present Ms. Key's mother's testimony that Ms. Key's hair was not short or red." *Id.*

The court found that contrary to Petitioner's assertions, Ms. Dudley had investigated each of the "supposed alibi witnesses." *Id.*, R. 230. The court described the testimony that had been heard from Henry Johnson at the hearing, which differed significantly from what Johnson had told Ms. Dudley's investigator prior to trial, and determined that:

> the credible evidence is that [Johnson] told Ms. Dudley or her investigator none of these things prior to trial even though he was contacted and

interviewed.  Ms. Dudley can hardly be faulted for failing to present
testimony the witness never supported during the investigation.

*Id.*, R. 230.

All of these factual findings are supported by evidence presented at the hearing.

The state court's factual determinations are presumed correct unless the Petitioner

rebuts the presumption by clear and convincing evidence.  § 2254(e)(1).  Petitioner has

not done so.  There was no need for family witnesses as to the length and color of

Petitioner's hair because the booking photograph was the best evidence.  Further,

before trial Henry Johnson and Frances McKinney did not provide a credible alibi.

McKinney could remember nothing.  Johnson did not mention attending a party that

night, and, had he adhered to what he told Dudley, would have established that

Petitioner had previously "refreshed" his memory by reminding him that they watched

television that evening, instead of going to a birthday party.  Thus, the conclusion by the

state court that Petitioner did not prove a claim of ineffective assistance of counsel as to

these matters has not "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  § 2254(d)(1).

**Ground seven**

Petitioner contends that his attorney was ineffective for failing to use Henry

Johnson as an alibi witness.  Doc. 1, p. 12c (p. 14 on ECF).  The claim is without merit

for the reasons set forth above.

**Grounds eight through fourteen, and sixteen through eighteen**

Ground eight contends that counsel was ineffective for failing to object to the fact that the court gave the final charge before closing arguments.  Doc. 1, p. 12d (p. 15 on ECF).

Ground nine argues that counsel was ineffective for failing to object to the request that the court instruct the jury again as to weighing the evidence, testimony of witness, a plea of not guilty, reasonable doubt, and burden of proof.  Doc. 1, p. 12e (p. 16 on ECF).

Ground ten claims that Petitioner's attorney was ineffective for failing to object to an incomplete robbery instruction.  Doc. 1, p. 12f (p. 17 on ECF).

Ground eleven contends that Petitioner's attorney erred in failing to request a jury instruction as to Petitioner's out-of-court statement.  Doc. 1, p. 12g (p. 18 on ECF).

Ground twelve contends that Petitioner's lawyer was ineffective for failing to request an instruction on note-taking by the jury.  Doc. 1, p. 12h (p. 19 on ECF).

Ground thirteen asserts that counsel was ineffective for failing to object to the jury returning inconsistent verdicts and failing to move to dismiss.  Doc. 1, p. 12i (p. 20 on ECF).

Ground fourteen claims ineffectiveness in failing to allow Petitioner to testify. Doc. 1, p. 12j (p. 21 on ECF).

Ground sixteen contends that trial counsel was ineffective for failing to object to closing argument.  Doc. 1, p. 12l (p. 23 on ECF).

Ground seventeen asserts that counsel was ineffective for failing to interview Ms. Sinclair for sentencing.  Doc. 1, p. 12m (p. 24 on ECF).

Ground eighteen contends that counsel was ineffective for failing to object to Petitioner's sentence. Doc. 1, p. 12m (p. 24 on ECF).

Respondent argues procedural default as to each of these claims because the claims were not presented on appeal from denial of Rule 3.850 relief. Doc. 13, pp. 17-18. Respondent is correct. None of these claims were presented on appeal from denial of the Rule 3.850 motion. Ex. O, pp. 8-9 (summary of argument), 10-16. Petitioner has not shown cause for these procedural defaults, or prejudice to the outcome. The court should not reach the merits of these claims.[7]

**Ground fifteen**

This ground generally faults counsel for not interviewing witnesses, investigating alibi witnesses, and failing to obtain DNA testing of the hat. The claim fails for the reasons discussed above.

**Ground nineteen**

Ground nineteen argues that counsel's cumulative errors denied a fundamentally fair trial. Doc. 1, p. 12n (p. 25 on ECF). A claim of cumulative ineffectiveness fails if the individually alleged instances of ineffectiveness are without merit. Sims v. Singletary, 155 F.3d 1297, 1309 (11th Cir. 1998), *cert. denied*, 527 U.S. 1025 (1999). *Cf.*, United States v. Culver, 598 F.3d 740, 751 (11th Cir. 2010) (doctrine of cumulative trial error does not apply where the trial court commits no individual errors, citing United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir.2004)).

---

[7] Respondent also argues that ground twelve is not a federal claim. Doc. 13, p. 17. It is unnecessary to decide that point.

Most of the claims of ineffectiveness are procedurally defaulted. The ones that are not were denied by the state court for sufficient reasons. Thus, there was no error to accumulate.

**Certificate of Appealability**

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 11(b).

I find no substantial showing of the denial of a constitutional right. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Delilah Key challenging her conviction for burglary of a dwelling

with a person assaulted in the Circuit Court of the Second Judicial Circuit, in and for

Leon County, Florida, case number 2003CF831A1, be **DENIED WITH PREJUDICE** and

that a certificate of appealability be **DENIED** pursuant to § 2254 Rule 11(a).

      **IN CHAMBERS** at Tallahassee, Florida, on December 27, 2010.


                **s/     William C. Sherrill, Jr.**
                **WILLIAM C. SHERRILL, JR.**
                **UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

      **A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**